[No. H007097. Sixth Dist. Apr. 24, 1991.]

FRANK KNIGHTS, Plaintiff and Appellant, v.
HEWLETT PACKARD et al., Defendant and Respondent.

**COUNSEL**

Silver & Katz and Louis D. Silver for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Christopher J. Martin and Craig A. Selness for Defendant and Respondent.

**OPINION**

**CAPACCIOLI, J.**—Plaintiff Frank Knights appeals the judgment entered after the trial court granted summary judgment to defendants Hewlett Packard (HP) and several of its managerial employees. (Code Civ. Proc., § 437c.) In this wrongful termination suit plaintiff contends on appeal that a contract existed between the parties requiring good cause to terminate, and that there were triable issues of fact as to good cause, defeating the summary judgment motion. We affirm for the reasons stated below.

*Facts*

Knights began working at HP as a custodian on March 1, 1984. In May of 1985 he was given a written warning about his performance and attendance problems. The written warning said Knights had to be more dependable or further disciplinary action up to and including termination would be taken. Knights improved his attendance and was taken off probation in September of 1985.

On October 31, 1985, Knights injured his knee when he slipped and fell while cleaning a rest room at work. His supervisor, defendant Virgil Ganiban, helped Knights to the lobby where he called a taxi to take Knights to an emergency clinic. The physician who examined Knights released him to return to work on November 20, 1985. Knights did not return to work in November or even in December of 1985. Knights obtained a doctor's certificate extending his medical leave and releasing him to return to work on January 2, 1986. Instead of returning to work, however, he called his supervisor and told him he had to use hotel reservations for a trip to Monterey that he had won in a raffle on January 2 and 3, so he could not return at that time.

After the vacation in Monterey, Knights still failed to return to work or to notify HP he would be absent. HP sent Knights a telegram on January 9, 1986, which stated: "You have been absent from work since January 6[,] 1986 and we have had no contact from you. This telegram is being sent to you as notification that *unless you report to work on or before Monday,*

*January 13 [,] 1986, at 6 pm your employment with Hewlett-Packard Company will be terminated."* (Italics added.)

Knights' response to this telegram was to call HP and verbally abuse a number of clerical workers. When he did return to HP on January 13, 1986, Knights requested a personal leave of absence because he "was unhappy with everything around" him. HP's human resources liaison Dave Kiyasu told Knights to take the next few days off at company expense, and he also set up an appointment for Knights with a psychologist. The psychologist recommended that Knights take time off work for two to six weeks and meet several times with a mental health professional. HP offered Knights a full six-week personal leave of absence. This offer was memorialized in a letter dated January 31, 1986, from Kiyasu to Knights: "Consequently, we offered you a personal leave of absence for a six (6) week period, effective Monday, January 27, 1986 through Sunday, March 9, 1986; this leave was offered with a guarantee to return you to a job of similar status and pay, as long as you return to work by 6:00 p.m. on Monday, March 10, 1986. *Requests for extension(s) of your leave will be considered; if approved, you will not be guaranteed a job."* (Italics added.)

On March 5, 1986, Kiyasu sent Knights a telegram reminding him to report to work on March 10, 1986, or to call Kiyasu by March 7, 1986 if he desired to extend his leave. Knights did not call Kiyasu until the morning of March 10th, thinking that his leave had to expire before he requested an extension.

Knights asked for an extension but was not sure how much time he wanted, so Kiyasu asked him to let him know by Monday, March 17, how much time he wanted. Kiyasu's confirming letter asked Knights to contact him by March 17, and indicated that an extension of up to 10 weeks could be granted but made clear that Knights was no longer guaranteed a job. Knights did not contact Kiyasu by March 17. On March 19, Kiyasu sent Knights another Mailgram which stated: "You agreed to let us know how long you would be extending your personal leave of absence by Monday, March 17, 1986. *If we do not hear from you by Friday, March 21, 1986 we will assume you are no longer interested in being employed by Hewlett Packard and will terminate your employment."* (Italics added.)

Knights did not call Kiyasu until March 24, 1986, by which time HP had terminated his employment. Knights's explanation for why he did not receive the Mailgram soon enough to respond to it on time was that he does not take his mail out of the mailbox unless he is expecting one of two regular monthly bills. Thus, he did not discover the Mailgram asking him to call by Friday March 21 until Saturday March 22.

## Standard of Review

"Summary judgment is properly granted only when the evidence in support of the motion establishes that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. [Citations.]" (*Fowler* v. *Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 37 [241 Cal.Rptr. 539].) Since a motion for summary judgment raises only questions of law regarding the construction and effect of the supporting and opposing papers, we review them independently. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) We identify the issues framed by the pleadings, determine whether moving party's showing has negated the opponent's claim, and determine whether the opposition raises a triable issue of fact. (*Id.* at pp. 1064-1065.) "Doubts as to the propriety of summary judgment are resolved against granting the motion. [Citations.]" (*Fowler* v. *Varian Associates, Inc., supra*, 196 Cal.App.3d at p. 37.)

## Discussion

Knights contends the trial court erred in granting summary judgment in two respects. First, the court found an at-will employment relationship rather than a contract expressed in the personnel policies, and second, the court erred in failing to find triable issues of fact with respect to whether there was good cause for termination. We find the court correctly granted HP's summary judgment motion.

At issue are plaintiff's first two causes of action for wrongful termination and breach of the implied covenant. Plaintiff pleads an oral contract of employment modified by certain of HP's written personnel policies. Plaintiff contends that HP's personnel policies applied to him and required good cause for his termination. Plaintiff claims there was no good cause for his discharge.

Knights concedes that his employment with HP was to be of indefinite duration. Employment for an indefinite term is presumed to be at-will. (Lab. Code, § 2922; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373].) This presumption may be rebutted by a contract, express or implied, that limits the employer's right to terminate. (*Ibid.*) A promise not to terminate except for good cause may be implied in fact from a number of sources—the employee's longevity of service, the employer's assurances of continued employment, an unwritten policy that is routinely followed, common practice in the industry involved, etc. (See, e.g., *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 329

[171 Cal.Rptr. 917]; *Hepp* v. *Lockheed-California Co.* (1978) 86 Cal.App.3d 714, 716 [150 Cal.Rptr. 408].)

 Knights contends that HP's personnel policies regarding termination were a part of his employment contract, and that HP did not comply with its own policies. Knights is mistaken. The "Terminations Section" of HP's personnel policies and guidelines contains an introductory statement which concludes: "The following is a guide for supervisors involved with an employment termination." Even if Knights had shown the policies applied to him and that he relied on them, it is unclear in what way HP violated the policies.

On its summary judgment motion HP relied on the presumption that plaintiff's employment was at will, and pointed out that the burden was on plaintiff to demonstrate a promise, express or implied, not to terminate except for good cause. HP also argued, assuming that it was required, that good cause existed for plaintiff's termination. Evidently the trial court agreed with HP and so do we.

In opposition plaintiff did not raise a triable issue as to whether HP promised only to terminate on cause. Plaintiff had no longevity of service and the personnel policies were guidelines only. Even if the policies had been mandatory, involuntary termination was permitted for unacceptable performance. By any standard or definition we think plaintiff's conduct would fall into that category. Whether Knights' performance was unacceptable and whether good cause for discharge existed are issues that may be determined on a summary judgment motion. (*Fowler* v. *Varian Associates, Inc., supra,* 196 Cal.App.3d 34, 42-43.)

After his knee injury plaintiff was scheduled to return to work in November of 1985. He did not return during November or December. Next he was due to return on January 2, and instead he took a vacation in Monterey. After he returned to town, Knights did not trouble himself to go to work the next week or to call HP to let them know he would be absent. HP sent Knights a telegram telling him to return to work on January 13th. He returned, but only to request a leave of absence because he was unhappy with everything. After a referral to a psychologist who recommended a six-week leave of absence which was granted, Knights was due back to work on March 10th. The human resources manager sent Knights a telegram reminding him to return to work on the 10th, or else to call by the 7th to request an extension of his leave. Knights did not call by March 7. Knights called on March 10th in the morning to request an extension, but he was not sure how long an extension he needed. Kiyasu asked Knights to let him know by the 17th how long an extension he wanted. Kiyasu sent Knights a letter reminding him to let him

know by the 17th how long he would be out. Knights did not contact HP by March 17. Kiyasu sent another telegram on March 19, asking Knights to contact him by March 21, or he would be terminated. Knights did not contact him by March 21. Between October of 1985 and March 1986 Knights actually worked at HP for less than three days. We think it abundantly clear that Knights's performance was unsatisfactory and constituted good cause for termination.

The judgment is affirmed. Costs are awarded to respondents.

Agliano, P. J., and Bamattre-Manoukian, J., concurred.