Barbara P. SARGENT, Plaintiff,

v.

LITTON SYSTEMS, INC.,
et al., Defendants.

No. C–93–1365 MHP.

United States District Court,
N.D. California.

Jan. 18, 1994.

## MEMORANDUM AND ORDER

PATEL, District Judge.

Plaintiff Barbara Sargent brought this action in state court on March 10, 1993 against Litton Systems, Inc., Litton Industries, Inc., Dalmo Victor, Inc., General Instrument Corp. and unnamed defendants, alleging injuries arising out of the termination of her employment at Litton Systems, Inc. The action was subsequently removed to this court on April 15, 1993.

Now before this court is the motion of Litton Systems, Inc. and Litton Industries, Inc. (collectively, "Litton") for summary judgment on Ms. Sargent's claim under California's Fair Employment and Housing Act, Cal.Govt.Code § 12940 ("FEHA"). Having

considered the parties' submissions and oral argument, the court enters the following memorandum and order.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted:

> against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by 'depositions, answers to interrogatories, or admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The moving party does not surmount its initial burden through conclusory allegations as to the state of the material on file, however, it is not required to "support its motion with affidavits or other similar material negating the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

The court's function on a motion for summary judgment is not to make credibility determinations. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

## BACKGROUND

Ms. Sargent began working for Dalmo Victor in its Belmont, California facility in approximately September 1980. *See* Joint Statement of Undisputed Facts ¶ 1. Sometime around August 1991, Litton Systems, Inc. ("LSI"), through its Applied Technology Division, acquired the assets of Dalmo Victor. *Id.* ¶ 2. LSI is a subsidiary of Litton Industries, Inc. At the time of the acquisition, LSI offered employment to Ms. Sargent and she accepted. *Id.*

According to Ms. Sargent, she has suffered from a chronic condition in her back and in the back of her neck since at least 1988. The condition makes it painful (or impossible) for her to do any heavy lifting or to turn her head upwards or to the side for more than a brief interval. In addition, it is painful for her to drive a car for over twenty minutes and unbearably painful for her to do so for over an hour. She has less difficulty riding as a passenger, since it is easier to shift positions as a passenger. *See* Declaration of Barbara Sargent ¶ 3.[1]

In December 1991, Ms. Sargent's department moved from the former Dalmo Victor facility in Belmont to LSI's facility in San Jose. In the course of packing her personal effects for the anticipated move, Ms. Sargent alleges that she exacerbated her back injury. *See id.* ¶ 2. Additionally, as a result of this transfer Ms. Sargent's commute to work from home by her car increased from about twenty minutes to over an hour. *See id.* ¶ 4. On January 5, 1992, Ms. Sargent tendered a typed resignation letter to Tom Conway, a human resource specialist at LSI, and Terry

---

**1.** Ms. Sargent also alleged in her complaint that she suffers from a hand condition and that she was discriminated against on this basis. As explained below, neither of the defenses that Litton is attempting to prevail on in this summary judgment motion depend on whether or not she had this disability.

Schmidt, her manager at LSI.[2] The letter stated:

> Regretfully, due to my back condition, and upon advice of my physician, I must hereby submit my resignation which will become effective immediately.
>
> I am unable to tolerate the long commute to the [San Jose] facility because of my physical disability.

*Id.*, Ex. 1. Mr. Schmidt suggested that instead of resigning, Ms. Sargent see her physician regarding a medical leave of absence. Joint Statement of Undisputed Facts ¶ 4. Ms. Sargent agreed and took back her resignation letter. Ms. Sargent claims that Mr. Conway then handed her a leave of absence form and told her to see a doctor as soon as possible. According to Ms. Sargent, she was not told when she was supposed to return from her leave of absence but understood that she was supposed to see a doctor and let him decide. Sargent Decl. ¶ 8.

It is unclear what Litton's position is with regard to the next several days when Ms. Sargent did not report to work. Litton has submitted a declaration from Frank Rabow, the Employee Relations Manager for LSI's Applied Technology Division, which refers to a mailgram he sent to Ms. Sargent on January 30, 1992; this declaration and attached exhibit appear to indicate that it was LSI's contention that Ms. Sargent was on sick leave from January 6, 1992 to January 12, 1992. *See* Declaration of Frank Rabow ¶ 4 & Ex. A. The joint statement of undisputed facts, however, states that Ms. Sargent went on disability leave. *See* Joint Statement of Undisputed Facts ¶ 5. At any rate, according to Litton Ms. Sargent failed to report to work and failed to explain her absence from January 13, 1992 to February 18, 1992. *See* Rabow Decl. ¶ 4–6.

Ms. Sargent, on the other hand tells a different story. According to Ms. Sargent, on the day following her meeting with Mr. Schmidt and Mr. Conway she became ill, which kept her from seeing a doctor about her back. She states that she had her husband call Litton to notify them that she

would be delayed in seeing the doctor about her medical leave. On January 15, 1992, Ms. Sargent went to her orthopedist who examined her and diagnosed her as having cervical spondylitis, a back condition, as well as arthritis of the right thumb. He noted this on her leave of absence form; either he or Ms. Sargent apparently then mailed the form to LSI. Sometime before January 30, 1992, LSI sent the form back to Ms. Sargent, telling her that her doctor had neglected to fill in some necessary parts of the form, notably the sections which asked for dates of disability and when the employee would be able to return to work.

Both parties agree that on January 30, 1992, Frank Rabow, the LSI Employee Relations Manager, sent Ms. Sargent a mailgram. In that mailgram, Mr. Rabow stated that Ms. Sargent had been given five days sick leave on January 6, 1992; that LSI had received the incomplete leave of absence form on January 22, 1992; and that a LSI employee had called Ms. Sargent's doctor the following day, who stated that Ms. Sargent was not disabled so as not to be able to perform her job. *See* Rabow Decl., Ex. A.

Ms. Sargent alleges that on receiving this mailgram, she called her doctor and spoke with his assistant, who stated that to her knowledge the doctor had not told anyone at LSI that Ms. Sargent was able to work. Ms. Sargent further alleges that she was called on February 6, 1992 by Rick Giovannetti, apparently LSI's Director of Human Resources. She told him that she had taken the incomplete leave form back to her doctor and that he would fax it to LSI. She also told Mr. Giovannetti that her doctor had not told LSI that she was not disabled. According to Ms. Sargent, Frank Rabow called her on February 6, 1992 to tell her that they had received the completed application from the doctor and that the application indicated that her disability ended on February 6, 1992; that someone at LSI had confirmed this information with the doctor; and that she was expected to report to work the following morning. *See* Sargent Decl. ¶ 17–18. The

---

**2.** Although Litton refers in its papers to this meeting having occurred on January 6, 1992, the joint statement of facts submitted by both parties states that the meeting occurred on January 5, 1992.

parties dispute what date Ms. Sargent's doctor indicated was the end date for her disability. *Compare* Declaration of Dr. F. Scott Smyth, Jr. ¶ 7–9 *with* Rabow Decl. ¶ 4–6, Ex. 2.

Ms. Sargent did not report to work. On February 18, 1992, LSI sent her a letter stating that they were terminating her employment because they interpreted her absence as voluntary abandonment of her job. Joint Statement ¶ 6. According to Ms. Sargent, Litton continued to pay her disability benefits through June 1992. Sargent Decl. ¶ 24.

*DISCUSSION*

California Government Code § 12940 makes it unlawful for an employer to discharge an employee because of the employee's physical handicap or medical condition, unless the person cannot perform his or her essential duties even with reasonable accommodations. Cal.Govt.Code § 12940. Employers must make such accommodations unless doing so would create an "undue hardship." Cal.Code Reg. § 7293.9.[3]

Defendants concede, at least for purposes of this motion, that Ms. Sargent's back problems constitute a physical handicap as defined in section 12940. It appears from defendants' moving papers that they are making three arguments: 1) that Ms. Sargent was fired because she was absent from work without explanation; 2) that she was fired because LSI had no duty to reasonably accommodate her back condition; and 3) that she was fired because she was unable to perform her essential job functions even af-

ter Litton reasonably accommodated her back condition.[4]

The first of these defenses does not turn on Ms. Sargent's disability. Essentially what defendants argue is that, whether Ms. Sargent was disabled or not, she was absent from work without explanation for over a month, which constituted independent grounds for terminating her. As support, they cite *Knights v. Hewlett Packard et al.,* 230 Cal.App.3d 775, 281 Cal.Rptr. 295 (1991), a case brought for wrongful termination, not for termination in violation of FEHA. In that case, it was undisputed that the employee in question had been repeatedly and explicitly warned by his employer that his leave of absence was over and that he would have to request an extension if he did not want to be terminated. The court therefore held that summary judgment in favor of the employer was appropriate on the employee's wrongful termination claim. *Id.* at 779–81, 281 Cal.Rptr. 295.

In contrast, in the instant case there are numerous fact disputes as to exactly what information was being relayed back and forth between LSI and Ms. Sargent during her absence. The parties dispute exactly what was said to Ms. Sargent when she went on disability leave; how long the leave was supposed to last; whom she contacted at Litton during her leave; what contacts Litton had with Ms. Sargent during that time; and what Ms. Sargent's doctor represented to Litton about her absence. Practically all of the pertinent facts are in dispute, making it improper to grant summary judgment on this basis.[5]

---

**3.** The court accepts these regulations as binding. *See Ackerman v. Western Elec. Co.,* 643 F.Supp. 836, 843 (N.D.Cal.1986), *aff'd* 860 F.2d 1514 (9th Cir.1988).

**4.** In either case, the question of Ms. Sargent's hand condition is irrelevant. If Litton could prove that summary judgment were appropriate on the ground that Ms. Sargent was terminated because she was absent without explanation or because her back condition could not be reasonably accommodated, then the issue of her other claimed disability would be irrelevant.

**5.** Indeed, even on the basis of the facts that *Litton* urges this court to adopt, it seems doubtful that Litton could prevail on this ground. It is

disingenuous, to say the least, for Litton to claim that Ms. Sargent's absence from January 13, 1992 to February 18, 1992 was "without explanation." Litton admits that Ms. Sargent went on disability leave after speaking with Mr. Schmidt and Mr. Conway. *See* Joint Statement of Undisputed Facts ¶ 5. Neither of these employees has submitted a declaration to say that Ms. Sargent was told how long the disability leave was supposed to last. It hardly seems as if an employee who stays at home after being told by her supervisor and her supervisor's supervisor to go on disability leave has gone AWOL. Ms. Sargent has further pointed to evidence (undisputed for the most part) to show that she, her husband and her doctor were in touch with various LSI employees repeatedly over the next several weeks.

█ Defendants' second line of defense is that LSI was under no duty to accommodate Ms. Sargent since her disability only impeded her ability to get to work, not to perform once she got there. Defendants repeatedly urge this court to adopt a bright line rule that employers have no duty to get their employees to work and therefore LSI had no duty to accommodate Ms. Sargent's disability.

█ Neither the law nor caselaw supports such a rigid interpretation of FEHA. The law and its regulations make clear that the term "reasonable accommodation" is to be interpreted flexibly. The regulations provide a non-exhaustive list of accommodations that includes not only making premises accessible but also "[j]ob restructuring, assignment or transfer, [and] part-time or modified work schedules...." Cal.Code Reg. § 7293.9. The law and the regulations clearly contemplate not only that employers remove obstacles that are in the way of the progress of the disabled, but that they actively re-structure their way of doing business in order to accommodate the needs of their disabled employees. There are limits on the re-structuring that an employer needs to do. Accommodations need only be "reasonable". An employer need not undertake an accommodation that would create an "undue hardship." *Id.* But to read into the law a hard and fast rule that its effects stop at some artificial boundary would be to ignore the broad sweep of the law.

The Ninth Circuit, interpreting analogous federal law, has similarly rejected such categorical rules.[6] In *Buckingham v. United States*, 998 F.2d 735 (9th Cir.1993), the court upheld the denial of summary judgment for an employer that claimed it had no duty under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, to transfer an employee with AIDS to a location closer to medical facilities. *Id.* at 740–41. The court rejected the argument that the Rehabilitation Act creates a *per se* rule against employee transfers as a means of reasonable accommodation. The court noted the "wide range of strategies" approved as accommodations under the federal disability law and refused to adopt rigid limits on possible strategies of accommodation. *See id.* (citing cases).[7] This court likewise rejects defendants' attempts to carve a rigid rule from what is by all accounts a law that was designed to encourage flexibility and accommodation.

█ LSI apparently made some efforts at accommodation, despite its present claims that it had no duty to do so. The extent of these efforts is disputed, however. For instance, LSI offered Ms. Sargent a leave from work, although the type of leave and its duration are disputed. Such an accommodation is certainly within the realm of possibilities that are envisioned by FEHA. *See Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 878–79 (9th Cir.1989) (leave of absence is reasonable accommodation under analogous Washington state law), *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990). LSI also apparently works with its employees to set up carpools, quite apart from whether or not they are disabled, and may have made this option known to Ms. Sargent. Any such efforts to accommodate Ms. Sargent's back condition would also certainly be relevant to the question of LSI's liability

LSI even apparently paid Ms. Sargent disability payments until June 1992.

6. The California Supreme Court has noted that FEHA was modeled on the Rehabilitation Act and that interpretations of that law are useful to examine in deciding cases under FEHA. *Cassista v. Community Foods, Inc.,* 5 Cal.4th 1050, 1063, 22 Cal.Rptr.2d 287, 856 P.2d 1143 (1993).

7. Litton's cites to cases from other districts in which courts *have* rejected employee transfers are therefore unhelpful. *See Fowler v. Frank,* 702 F.Supp. 143, 144–45 (E.D.Mich.1988). It is worth noting that, even though the court in this case held that a transfer was not a reasonable accommodation, it did so after noting that the employer in question had already tried to accommodate the plaintiff's disability by re-structuring her position for her. *Id.* at 146–48. As noted above, Litton's attempts at accommodation were meager at best.

Other cases that indicate, mostly in dicta, that an employer is under no duty to *create* a new job for a disabled employee are also inapposite, since this is not what Ms. Sargent argues should be done in this case. *Cf. School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307 (1987); *Davis v. U.S. Postal Service,* 675 F.Supp. 225, 233 (M.D.Pa.1987).

under the Act. Again, however, the parties dispute the extent to which LSI communicated this option to Ms. Sargent.

■ Other accommodations may have also been possible. With faxes and car phones and home offices, it is no longer the case that an employee must always be physically on site in order to perform her job. This is not to say that LSI necessarily had a duty to restructure Ms. Sargent's job in such a fashion; it is rather to say that FEHA does not categorically put such major re-structuring outside an employer's duties. *See Langon v. Dep't of Health and Human Services,* 959 F.2d 1053, 1060–61 (D.C.Cir.1992) (remanding for consideration of whether employee could work at home).

■ The real flaw in defendants' assertion that no reasonable accommodation was possible for Ms. Sargent's back condition is that they apparently terminated her without exploring any other options with her in a meaningful way. The hallmark of FEHA is the flexibility it requires of employers to work with its disabled employees to accommodate their needs. *See Buckingham,* 998 F.2d at 740 (under Rehabilitation Act, employer must do more than speculate about what accommodations are feasible); *Langon,* 959 F.2d at 1060–61 (same). From the undisputed facts before this court, it is not possible to tell either what efforts at accommodation were made, or what efforts could have been undertaken without undue hardship. For this reason, it is improper to hold on a summary judgment motion that LSI reasonably accommodated Ms. Sargent's disability.[8]

## CONCLUSION

For the foregoing reasons, the motion of defendant Litton Systems, Inc. and defendant Litton Industries, Inc. for summary judgment on plaintiff Barbara Sargent's claim of discrimination in violation of Califor-

nia's Fair Housing and Employment Act, Cal.Govt.Code § 12940, is hereby DENIED.

IT IS SO ORDERED.

---

**8.** Litton highlights several times in its papers its allegation that Ms. Sargent stated that she would have resigned within a few months even if she had not been transferred to San Jose. Perhaps this allegation, if proven, might have some relevance in assessing damages; it has no relevance to the question of whether Litton improperly terminated her.